May it please the Court. Steve Sadie for the Petitioners. The Administrative Procedure Act creates a duty for agencies to set policies justified by neutral principles and a reason to explanation. In Arrington, this Court struck down this precise regulation because the agency failed to articulate the grounds for its purportedly common-sense decision anywhere in the administrative record. Then in Crickin, this Court again addressed the same regulation. This time, the Court set out the types of considerations necessary to justify this type of categorical exclusion. Pertinent research studies or case reviews. Articulation of any precursor findings upon which the agency relied. The analysis used to reach the conclusion. A substantive discussion of the rationale. So what's wrong with their statement about the guns? I would say it's none of the above. None of those things occurs. They've said that they think that the presence of guns is the – creates a reason for the exclusion, but none of the underlying considerations. For example, in making an agency rule, you'd have to look at other factors. For example, Congress has said that they want to have this available for the benefit of persons convicted of nonviolent offenses.  What are the additional costs of incarceration? Do we have any idea how many people are involved or how much money is lost? What's the effect on overcrowding in a system that is 38 percent overcapacity? What is the data upon which the rationale is based? One example we see in the Crickin part of this, they have a categorical exclusion for homicide. The – if you go on Google and put murder and recidivism, it's the lowest rate of recidivism ever. We don't have any data here, and the data is readily available. We have a generation, since 1996, people in this exact same class, hundreds of them, have been going through this system with this type of incentive, and with this incentive have been returned to the community. And I would submit from what we know of no effort to gather information, to make a rational decision based on the available material. There is simply no effort to provide a rational explanation for the decision. And, you know, if this type of decision were made in any other context, the types of context we see all the time in administrative law, it would be virtually absurd. It's like saying on the rearview cameras that just have been in the news recently. We think it's a good idea because it might reduce the level of injury to people from being backed up. Roberts. The Supreme Court in Lopez seemed to take at face value that the BOP has a good deal of discretion in this area. It didn't say anything about studies. It didn't say anything else. I realize they've got a footnote that sort of accepts the APA, any APA challenges. But that footnote is directed to whether they complied with the notice and comment provisions of the APA, which is just a sort of a technical, not so much an arbitrary and capricious challenge, but sort of a technical procedural challenge to the rule. It looks like the agency has tried to comply with Lopez. It's quoted Lopez and tried to go off of that. Every other court that's looked at this, other than ours, and we've taken a very, very strict look at this, has approved this rule. So what's the problem? It's a very serious problem. And that is because Lopez was strictly a matter of statutory construction. And we absolutely agree, as the Court already held in Bowen, that this, that you can make a – the statute is unambiguous that the may allows the agency to create a categorical rule that takes into consideration pre-conviction conduct. That is the extent of what Lopez held. It said it's permissible. Then the question becomes, did they comply with the APA? And that is what the Court addressed in Arrington. They did not. They have not even tried to. And what I think we have seen is basically they're laundering their litigation position in Lopez and then repeating it into a announcement of a final rule and calling that compliance with Crickin. It's miles away from Crickin. There's no consideration of other facts, and those facts are irrelevant. In addition, Your Honor, there is a legal error that has been continued in this rule. And we know that because look at the program statement. As the district court found, the program statement perpetuates the legal error that we have been raising with the agency since 1996. They are still saying that it's categorically a crime of violence. If that's the reason for this exercise of discretion, that is, under the Supreme Court in Kuhn, an error of law is by definition an abuse of discretion. It's a violation of 706 because it is contrary to law. And it is also demonstrates that rather than providing a neutral and rational basis for a rule, what we're really seeing is litigation by another means. In this context, we really need to have the types of study, the types of consideration. Now, I want to make clear that we are not saying what types of study have to occur. That's obviously within the agency's discretion. Let me back up. I may be two steps behind everybody on this one. My understanding of the BOP rule is that felon in possession is a crime of violence? Yes. It is so said in the program statement that the district court found violates the law. I have trouble seeing how any rationale supported in a degree of study says that being a felon in possession is a crime of violence. Are you saying that if they had a study somehow that a lot of data that that would tell me that that could be characterized as a crime of violence? No. What I'm saying is that there is a second alternative that the district court did support, which was the Bureau at the same time, as it said that it was a crime of violence, said that it was also exercising its discretion. If it were exercising its discretion based on studies, rationale, the types of consideration of costs, some idea of how many people we're talking about and what the prognosis has been in previous situations where these same people were deemed eligible, that I think that under Lopez I would have to say that they do have the discretion to do that, not when it's infected by the legal error, though. So your interpretation of Lopez is that even if the statute says that someone may be excluded from the program if there's been a crime, if he has been convicted of a crime of violence and the only crime of conviction is possession not connected to any other crime, you're saying that the BOP nonetheless has discretion to exclude? I am, Your Honor. If there is a crime of violence, then I think both Bowen, regardless of whether it's a crime of violence, Bowen and Lopez permit the agency to create other categorical exclusions of statutorily eligible prisoners. Within their discretion. If he's convicted of a crime of violence, he wouldn't be statutorily eligible. These folks are statutorily eligible. And that's why the total absence of any type of reasoning, any type of analysis, any type of rationale for the court to look at and say, okay, looking at these facts that have been considered by the agency, this is what they did to arrive at this conclusion, that's what the court needs to do. But they've given you none of the raw material to make that type of decision. What they've simply done is, we think this is so, and therefore it must be. And that's one of the things that is so interesting about criminal justice statistics. They have – Congress directed the agency to use empirically based practices in the reentry system. Right now, February 2012, the Government Accountability Office just issued a major study looking at the Bureau of Prisons and how it implements sentence reduction types of programs, including RDAP, pages 13 and 14, full of statistics about it. There's been no effort to even look. With all of those types of effort, looking at this as a very important public policy problem, we're supposed to just take it at face value. And we have a real good clinical example of how this can be terribly misleading and terribly injurious to the public policy. In 2007, when the crack retroactivity went into effect, the government, the Department of Justice said, this is going to create total chaos, this is going to be awful, all these people with guns and prior convictions are going to be released into the community early, it's going to be a conflagration in the urban areas. What happened was, as we've studied that we cite in the reply brief, nothing happened. It was easily put into effect. The ability of the probation office to administer supervised release was not affected, it was not that expensive, and there was no big spikes in danger. So we can't Counsel, you represent four different defendants here. I do. How many of them are still in custody? I believe only one. Their projected release dates were stated in the custody. I think at least two are out. Is that right? Peck and Moon? They're there. And you think maybe three of them, three of the four. And as we've stated, those folks who would be released to supervised release. Right. I understand we had the footnote in Arrington that suggested that that didn't move the case. But of those three, how many of them have completed RDAP? I cannot. Did you get any of them? I believe they all did, but I would have to check and I will supplement with a letter of advice in support of that. If they didn't complete RDAP, then is our footnote in Arrington applicable? I believe it is, Your Honor, because if the incentive did not operate as it should, then we would be in a position where they would still be able to take that into consideration. We've cited a number, I think six cases in this, where this Court has considered release on the supervised release after a grant of, or consideration of a 2241 habeas in the custody section of the opening brief, Your Honor. And I think that under those circumstances, if the, it was an unlawful, there was unlawfulness during the incarceration, for example, that they were not provided the incentive. But I think that that's, I think that they, that the people that we have are in their normal. There's still relief that we could offer people who are out of jail, even if they didn't complete the drug program. Seems a little counterintuitive, doesn't it, that we would be entitled to early release from their supervised release, even if they didn't, even if they never completed the program. They're not entitled to early release from supervised release. The cases from Reynolds, where the Court did a fairly extensive description of why the cases are not moved and why there is a potential for relief, focus on the ability of the, of the sentencing court to reduce, in its discretion, in the interest of justice, if in the interest of, a factor in the interest of justice, of course, is if they overserved the period of incarceration. So we are not asserting that he, that anybody has a right to a reduction of the supervised release, but it's a factor that the courts, district court, should reasonably consider and only can consider it if they know whether the incarceration was unlawful in any way. That's a good explanation. I would appreciate it if you'd supplement the record, if you could provide us with the water. I will. Let me know whether they completed the RDAF. With the Court's permission, I'll reserve it at the running time. Okay. Good morning, Your Honors. If it please the Court, Ron Silver, Assistant United States Attorney for the Respondent in this case. This court in Arrington, when this court decided Arrington and Crickin, basically, this court said to the Bureau of Prisons, what you're doing makes common sense. This court said that in Bowen, the Supreme Court said that in Lopez, but you haven't told us why you're doing it. And so the Bureau of Prisons went back and the Bureau of Prisons put its explanation into the administrative record. And the Court has that. It's excerpt of Record 122 and primarily 121 and 122 is where the Federal Register language that most directly affects Crickin and Arrington is set forth for the Court. That's page 1895. I'm sorry? Is that page 1895? I better have the ER in my paper copy. Your Honor, it's the Federal Register from January 14 of 2009. It was in Volume 2. It's repeated several times. I picked it up from the record we created for the case of Peck. That's the page on which they said. I've got page 1895. That's what I'm showing. Okay. I've got both ER and the page number of the Federal Register here as well. I didn't get access to their network. Yes, that's correct. 1894 and 1895 of the Federal Register. Thank you. I apologize. Okay. So I'm looking at it. Okay. And so basically what the Right. It starts in the middle column. Right. It starts in the middle column. And so basically what the Bureau of Prisons did is they relied in part they were relying on their experience, which this Court in Socorro says that they can do. And I do need to say that there has never been a decision that has required the kind of empirical studies that Mr. Sadie is requesting. Counsel, let me tell you what my problem is. Yes, Your Honor. I'm looking at that middle column on the Federal Register on page 1895, whatever your ER site is. 1895, okay. Right. Down at the bottom of that middle column, almost at the end, the Bureau of Prisons is just about to cite Lopez. And it says, the offense conduct of both armed defenders and certain recidivists suggests that they pose a particular risk to the public. There's a significant potential for violence from criminals who carry, possess, or use firearms. Okay? So far so good. Yes. Here's the problem. Then it quotes Lopez v. Davis. And the quote from Lopez says, denial of early release to all inmates who possess a firearm in connection with their current offense. Ration reflects the view that such inmates display a readiness to endanger another's life. And then the Bureau of Prisons repeats that language. The Bureau recognizes that there is a significant potential for violence from criminals who carry, possess, or use firearms while engaged in felonious activity. Yes, Your Honor. Now, in Lopez, Lopez was accused of carrying a weapon during the commission of another felony. He wasn't accused of carrying a weapon while being a felon, which would as itself a felony. So hasn't the Bureau tied itself to the idea of carrying a weapon while in the commission of another act? Well, in which case, a pure felon in possession would not satisfy the Bureau of Prisons' own stated criteria. Well, you have to recognize, Your Honor, that the Bureau has created this category based on its discretion. It is not using this under the assumption that a felon in possession is a crime of violence. That is not how these regulations are written. The regulations are written that in the Bureau's discretion, it views the person who is carrying a weapon and has possession of a weapon in the course of committing a crime, even if they don't use that weapon. But that's not what Judge Wybie is asking. Let's take a hypothetical taxpayer who commits fraud, felony fraud, convicted and, therefore, has a felonious record, didn't use any guns in connection with his falsification of tax returns or whatever led to his felonious or felony conviction. And he's got a prohibition on being, as a felon, of possessing a weapon. So now he's arrested for having a hunting rifle. He's going through the woods of Maine someplace and he shoots an elk if they have elk in Maine. And now he's picked up by the ranger and found that, hey, you didn't, you're not supposed to run a check on you and you're a felon, you shouldn't be having this rifle. So now he's convicted of felon in possession. So he's not committed any crime at the front end of carrying a weapon, and at the time of his crime of conviction and imprisonment, it was the fact that he had a prior felony that caused him to wind up in prison. So how does that fit within the rationale? Well, Your Honor, I think it fits in the sense that Lopez said, the Supreme Court in Lopez said that the Bureau of Prisons, in its discretion, can create categories. And that's in the context of the Bureau of Prisons dealing with a prison population of well over 200,000 individuals. And that when the Bureau is trying to administer a program for well over 200,000 prisoners, they have to do it on a categorical basis. Now, once an inmate is in the system and they decide whether they're going to get the same person you're describing in order to be eligible for the RDAP program, has to have a significant drug problem before they ever get into prison. You haven't answered my question, and you haven't answered Judge Fischer's question as far as I'm concerned. Let me take one more shot at it. Yes, Your Honor. Okay. The Bureau of Prisons says the problem that we're trying to address is that we think it's dangerous when people carry weapons in the commission of a felony, okay? Yes. In the hypothetical that Judge Fischer gave you, the felony was a passive felony. It was a felony for tax evasion. And the guy has got a gun rack on his car with a hunting rifle openly displayed, and somebody pulls him over for a traffic stop, a routine traffic stop, discovers the guy is a felon, and now he's got his possession of a rifle.  It's a status offense. The problem is he's carrying a weapon and he happens to have been a felony. There's no – the Bureau of Prisons says those who carry, possess, or use firearms while engaged in felonious activity. He's not carrying a weapon while engaged in felonious activity. The rationale doesn't match the rule. That's the problem. Well, I'm a little stumped in answering your question, and I appreciate the question the Court's asking. The – and the Bureau of Prisons has quoted Lopez, but the problem is that in Lopez, Lopez was caught carrying a weapon while committing another felony. Correct. And that isn't – that isn't the problem here. The problem here is that this applies to felons in possession in which you don't have to be committing a felony to violate the law. I suppose if they had said people who have a felonious background and then violate the – a statute prohibits a status person, a felony status person, from possessing weapons indicates a disrespect for the law and a danger, you know, to abiding public that they're possessing weapons, then we might have something to talk about. That's – that doesn't seem to be what they've said here. Well, Your Honor, and I appreciate you bringing up that analogy, I would like to take our main hunter out of his benign status. What we have is somebody who has been committed – who has been convicted of a felony. Somebody who has been convicted of a felony knows he may not possess a weapon. This person who has been convicted of a felony makes the conscious choice to go and buy a high-powered rifle that he has no right to have. Meanwhile, he's got a well-established drug problem and he manages to get himself arrested while he's up in Maine hunting an elk he has no right to hunt. With a weapon he certainly knows very well he has no right to possess. Let's suppose he's got every right to hunt the elk. It just turns out to be a felon in possession of a hunting rifle trying to shoot an elk. Well, he might have a right to hunt it with a bow and arrow, Your Honor, but if he's a felon, he's not going to have a right to use a high-powered rifle. The taking down of the elk is not the problem. I understand. I want to make sure that we're careful on that one. Okay. It's okay to shoot the elk in Maine. And I don't hear my colleagues saying that the rule cannot be written the way the BOP has written the rule and cannot be justified. I think I hear them saying the justification proffered doesn't support it. I'm sympathetic to your argument a bit earlier that the BOP will do much better with categorical rules that it can apply fairly mechanically. And if felon possession is a crime that's outside the purview of the statute that allows the drug treatment to give a reduction in sentence, that's easier to do. It also would be, I think, categorical and to that degree then fairly easy to administer if the prior felony that is then the premise for conviction for felon in possession was a violent felony. Now, I can well understand that there would be a good rationale. He's in prison for a violent felony. He's now out. And we now catch him felon in possession. I think there's every reason to support a rule that says felon in possession in that And that's a categorical rule. But they didn't do that. There's all felons in possession. And we are all familiar with people with drug problems who do financial frauds. I mean, high end lawyers do financial fraud tax evasion because they have drug problems. They are not violent. They're felons. They're cheats. They shouldn't do it. Wait a minute. They're lawyers. Oh, I show you. So this sweeps broadly. And the rationale doesn't capture the whole sweep. Well, I would not disagree with Your Honor that the rationale does not capture the whole  There has to be, you know, and it's, again, it's within the Bureau's discretion to sort out where is this going to go.  Which is what was the issue in Crickin and the categories that the Bureau has taken of, you know, murder and arson and robbery. Those are all violent, you know, well-recognized violent events. Can I ask a question about that rationale? Absolutely, Your Honor. There's an argument made that you didn't, the Bureau didn't address what I'll call stale priors. In other words, prior offenses that were so long ago that there's no rational, no apparent rational connection relying just on the fact of the prior. What's your response to that? My response, Your Honor, is that they could have. They could have made the decision to try to come up with a time limit. And yet there is no requirement that they do so. I believe their discretion, as long as their discretion is rational in the sense that they are looking at truly violent offenses, that that is within their broad discretion. Yes, could they have looked at a time limit? Absolutely. They chose not to. And the, it's appropriate so long as what the categories are, are reasonable and rational categories. And I think when you look at the, you know, I talked about murder, robbery, you know, child abuse, these are rational categories that they explain why they use those categories. And they made the decision not to put a time limit on it. That was well within their discretion to do. And they don't have to explain why? I do not believe they have to, Your Honor. You know, do they have to explain 1 year, 5 years, 20 years? What they have to explain is, you know, why that offense. After our decision in Cricken, doesn't BOP have to explain that, though? I mean, can we approve this rule without any temporal limitation on the use of prior crimes after our decision in Cricken? Yes, I believe you can, Your Honor. How do you do that? Because Cricken said, you know, it's interesting. The court in Cricken said basically any decision they made likely could withstand scrutiny as long as they explained it. And the decision was, you know, why are you picking these crimes? And the Bureau explained why they picked the crimes. Cricken doesn't tell the Bureau, and you've got to explain how far you're going back and why you're only going back that and not a day further or not a day closer. This court in Cricken told the Bureau, you've got to, you know, it doesn't take much to convince us that you've exercised your discretion. It doesn't take much to show us that we can discern your path. And that's really the question. Can you discern why the Bureau decided to pick these crimes? And the answer now is yes, you can. And I do not believe that this court told the Bureau, and you've got to tell us exactly why you're picking this date and not a date before or not a date after. You've got to tell us why you've chosen these crimes. The crimes kind of make sense to us, but you need to tell us why they make sense, because you didn't. And I believe the Bureau has done that.  Address the time element? Yes. I do not recall that I saw that, Your Honor. I don't recall that I saw it either. That's why I'm a little puzzled after Cricken why the BOP didn't do that. Well, it would have been nice if they had. They didn't. I can't make that up. What I can tell you is they did it, I think they did the job required by this court to explain why they chose the crimes they chose and how those relate to violence. And keeping in mind that when Congress passed this Act, they were looking at giving this benefit to nonviolent offenders. And so if somebody, you know, if in the Bureau's discretion they think somebody who committed a robbery 25 years ago falls within that ambit, that's within the Bureau's discretion. And I think the clock's going in the wrong direction, so I think I'm done. Okay. Thank you. Response? Judge Bivey, at page 987 of Cricken, it is more difficult to comprehend the rationale for including older convictions. It goes to footnote 8, which talks about how the Commission has a wealth of data available that they can look at to make a decision. I think that what we're seeing is pure defiance of Cricken, of Cricken, that the Court, the agency is simply not recognizing the Court's rulings as it didn't recognize the Court's ruling on it. In the, remind me, in the final rule and its explanation, did they deal with that temporal limitation at all? I mean, did they address it at all? Was it even mentioned in the rule? They said we have the authority to consider all prior convictions as excludable without any rationale or explanation. And I think that basically what we're seeing is repeatedly conclusory statements are substituting themselves for the types of reasoning, articulation of bases that is required under 706, that the agency's reliance on Sikora is misplaced because there the regulation was invalid, it was an interpretive rule, and here, unlike Sikora, we have a wealth of data from both footnote 8 where we, they, this Court has told the agency exactly what type of information is available to look at and analyze and to present to the public. Remember, this is in the context of an agency that has been lawless in this area for 17 years, and. Well, that's a little hyperbolic. I mean, we said they didn't explain what they did, even though some of what they did made sense. I'd like to come back to your suggestion that they didn't address temporal limits at all. On page 1894 of the register, again, the middle column, we're talking about these crimes, the prior crimes of violence, the director exercises discretion to deny early release eligibility to inmates who have a prior felony or misdemeanor conviction for these offenses because commission of such offenses rationally reflects the view that such inmates displayed readiness to endanger the public. Why does that have to have a temporal limitation? Just because we called it out in Crickin? The Court has, because there is no, this is nothing more than what was before the Court in Crickin. They said this is what we're doing, this is what, and. But we didn't, they didn't say, they didn't say before, wait a minute, let me finish my question. They did not say before that it rationally reflects the view that such inmates displayed when they committed their crimes. Readiness to endanger the public. That was. Before us in Crickin? In Crickin, yes, that was what the litigation. That statement was, that rationale was part of the record. The BOP presented that as their litigation position, that this is why. That was the litigation position at that point. It was the lawyers talking. Now we have it in the Federal Register as the Bureau of Prisons talking. The fact that it was articulated in litigation doesn't move me. If they go back and they say, you know, what our lawyers explained to the Court before is actually why we did it. I'm not going to hold that against them. They don't have to reinvent new words. I'm trying to find out whether this statement is, as you say, lawless ignorance or disrespect for Crickin, or whether it rationally could have been addressed to the temporal limitation. It could well have been made more specific, saying, regardless of how old that conviction was, but why can't it be implicit in what they're saying? I think the fact that we are sitting here trying to figure out what the heck was going on in the agency's mind and deliberative process. I'm not trying to figure it out. I'm just saying. They say they've displayed readiness to endanger the public. That tells me why they've decided, you know, somebody who has a history of readiness to endanger the public, where's going to be the line drawing that says, well, it's 15 years, 20 years, you know? I think the Supreme Court made the line drawing in State Farm where they said that the agency had to provide sufficient information to decide whether the facts found that the agency was making supported the conclusion they reached. We are getting conclusions, but no analysis of how they reached there. So instead, we're speculating and we hear the BOP argument that I just heard about why there would be a justification for felon possession, which is of course not in the administrative record, that those types of trying to figure out, okay, well, maybe this is what they were thinking, is what we're doing throughout the litigation in this, and the reason that we're doing that is because I'm going back to Paulson. We didn't have notice and opportunity to comment in the right way. That Paulson violation has never been remedied, so that's why I do think the historic basis for this rule should be a strong message from this Court that if you are going to promulgate a new rule and if you're going to address these things, we need to know that it was neutral, that it was not affected by the prior litigation positions, that it was not affected by the prior legal errors, that it's supported by the types of normal administrative record that you'd have for backing up a car or protecting against possession. Thank you. Roberts. Thank you. Thank you. Thank both sides for your helpful arguments. Thank you both. Peck v. Thomas, submitted for decision.
judges: Fletcher, Fisher, Bybee